ARKANSAS CHARCOAL COMPANY, A Division of Arrow Industries, Inc., and TXO Production Corp. *v.* ARKANSAS PUBLIC SERVICE COMMISSION and Arkansas Western Gas Company

CA 88-195 and CA 88-395                   762 S.W.2d 403

Court of Appeals of Arkansas
En Banc
Opinion delivered December 28, 1988
[Rehearing denied January 25, 1989.]

*Rose Law Firm, A Professional Association*, by: *Carol S. Arnold*, for appellant TXO Production Corp.; and *Ivester, Henry, Skinner & Camp*, by: *Hermann Ivester and Valerie F. Boyce*, for appellant Arkansas Charcoal Company.

*George C. Vena*, Asst. Counsel, for appellee Arkansas Public Service Commission.

*Keck, Makin & Cate*, by: *Robert Y. Hirasuna*, and *Jeffrey L. Dangeau*, for appellee Arkansas Western Gas Company.

*Steve Clark*, Att'y Gen., *Paul L. Cherry*, Asst. Att'y Gen., for appellee Consumer Utility Rate Advocacy Division.

*Kathleen D. Gardner* and *Sandra L. Smith*, for amici curiae Arkla, Inc.; Arkla Energy Resources; and Arkansas Lousiana Gas Company.

MELVIN MAYFIELD, Judge. Appellants, Arkansas Charcoal Company (ACC) and TXO Production Corporation (TXO), bring this appeal from orders of the Arkansas Public Service Commission (APSC) entered in APSC Docket Nos. 87-009-U and 88-092-U. By joint motion and stipulation of the parties, the

orders appealed from the latter docket were consolidated with those appealed from the first docket. The APSC appears here to defend its actions and is joined as appellee by the Attorney General of Arkansas, who participated below pursuant to statutory authority, and by Arkansas Western Gas Company (AWG), which initiated the proceedings below by petitioning the APSC to investigate the situation giving rise to this appeal. An *amicus curiae*, Arkansas Louisiana Gas Company, also takes the position that the actions of the APSC should be affirmed.

A clear understanding of the facts giving rise to this controversy is essential to its resolution. Appellee Arkansas Western Gas had for some years been ACC's sole natural gas supplier and owned the pipeline facilities which served ACC's plant. At some point, ACC and AWG were unable to reach an agreement which ACC found satisfactory for its natural gas requirements, and ACC attempted to reach an arrangement with AWG for transportation of gas from TXO's wells to ACC's plant through AWG's pipeline, but those efforts were unsuccessful. The failure to reach an agreement with AWG resulted in a "Gas Sales Agreement" dated July 2, 1986, entered into between the appellants, ACC and TXO.

Under the terms of this agreement, TXO, a natural gas production company not subject to regulation by the APSC, agreed to construct 14,500 feet of 4½-inch pipeline and nearly 12,000 feet of 2⅞-inch pipeline connecting various gas wells to a dehydration station. At the dehydration station, the gas is odorized, metered, and treated prior to delivery to ACC, for use in its charcoal manufacturing plant near Paris, in Logan County, Arkansas. Like TXO, ACC has never been subject to APSC regulation. ACC and TXO contemplated sale of the pipelines and related facilities by TXO to ACC after construction, which transfer was accomplished after the facility became operational in January of 1987. The pipelines traverse the countryside in easements purchased by ACC for that purpose and are designed to accommodate pressures of at least 1,433 pounds per square inch (psi).

On January 21, 1987, AWG filed a complaint with the appellee Arkansas Public Service Commission, and TXO was subsequently ordered by the APSC to appear and show cause why

it should not be subject to the jurisdiction of the Commission under the "Utility Facility Environmental and Economic Protection Act," Ark. Code Ann. Section 23-18-501 *et seq.* (1987), and why it should not be prohibited from selling natural gas to ACC. AWG also sought permission to abandon its existing pipeline connecting its gas supplies to the ACC plant in the event appellants were allowed to operate their pipeline. ACC intervened in the case to protect its interests in the pipeline and related facilities.

Hearings were commenced in late October of 1987, and in May of 1988, the Commission found by Order No. 38 that the pipeline and equipment constructed and operated by TXO and owned by ACC were a "major utility facility" subject to Commission jurisdiction and that an application for a "certificate of environmental compatibility and public need" should have been filed with the Commission prior to construction of the pipeline. Order No. 38 also directed the appellants to cease and desist operating the pipeline, and a rehearing was sought by appellants in early June of 1988. On June 28, 1988, the Commission issued Order No. 39, in which it denied rehearing and ordered compliance with all terms of Order No. 38 and directed that TXO and ACC cease operation of the pipeline within seventy-two hours. We temporarily stayed the Commission's cease and desist order, and that stay was later made permanent pending resolution of this appeal.

TXO and ACC contend on appeal that the finding that the pipeline was a "major utility facility" as defined by the Arkansas Code is wrong or, alternatively, that, even if the pipeline is considered to fall within the definition of a major utility facility, an "environmental impact statement" is all that must be filed with the Commission. They also claim the Commission lacks authority to order the appellants to cease and desist operation of the pipeline.

A "major utility facility," so far as a gas transmission line is concerned, is defined by Ark. Code Ann. Section 23-18-503(2)(C) (1987) as:

> For the sole purpose of requiring an environmental impact statement hereunder, a gas transmission line and associated facilities designed for, or capable of, transport-

ing gas at pressures in excess of one hundred twenty-five pounds per square inch (125 lbs. psi), extending a distance of more than one (1) mile, excepting, however, those gas pipelines devoted solely to the gathering of gas from gas wells constructed within the limits of any gas field as defined by the Oil and Gas Commission;

Ark. Code Ann. Section 23-18-503(5), (9) and (10) (1987) provide as follows:

(5) "Person" includes any individual, group, firm, partnership, corporation, cooperative association, municipality, government subdivision, government agency, local government, or other organization;

(9) "Public utility" or "utility" means any person engaged in the production, storage, distribution, sale, delivery, or furnishing of electricity or gas, or both, to or for the public, as defined in Section 23-1-101(4)(A)(i) and (4)(B);

(10) "Applicant" means the utility or other person making application to the commission for a certificate of environmental compatibility and public need.

Arkansas Code Annotated Section 23-1-101 (1987) provides:

As used in this act, unless the context otherwise requires:

(4)(A) "Public utility" includes persons and corporations, or their lessees, trustees, and receivers, owning or operating in this state equipment or facilities for:

(i) Producing, generating, transmitting, delivering, or furnishing gas, electricity, steam, or another agent for the production of light, heat, or power to, or for, the public for compensation;

. . . .

(C) the term "public utility," as to any public utility defined in subdivisions (4)(A)(i), and (ii) and (vi) of this section, shall not include any person or corporation, who or which furnishes the service or commodity exclusively to himself or itself, or to his or its employees or tenants, when the service or commodity is not resold to or used by others;

Ark. Code Ann. Section 23-18-510(a) (1987) reads in part as follows:

> (a) No person shall commence to construct a major utility facility in the state, except those exempted as provided in subsection (b) of this section, Section 23-18-504(a), and Section 23-18-508, without first having obtained a certificate of environmental compatibility and public need, hereafter called a "certificate," issued with respect to such facility by the commission.

Ark. Code Ann. Section 23-18-511 (1987) sets forth the matters which a "certificate of environmental compatibility and public need" must contain, including an "environmental impact statement," the contents of which are set out in section 23-18-511(8)(B). And, Ark. Code Ann. Section 23-18-507(a) (1987) provides:

> (a) Nothing in this subchapter shall be deemed to confer upon the Arkansas Public Service Commission power or jurisdiction to regulate or supervise the rates, service, or securities of any person not otherwise subject to the commission's jurisdiction.

█ The parties do not seriously quarrel over the actual physical characteristics of the pipeline itself, which are best described by David Minor, an engineer who is District Drilling Production Manager for TXO, as follows:

> Approximately 14,500 feet of 4½″ pipeline connecting the Earl "A" well to the Arkansas Charcoal Plant; 10,500 feet of 2⅞″ pipeline connecting the Kalamazoo No. 1 well to the Earl "A" line; a dehydration station near the Arkansas Charcoal plant where the gas is dehydrated, metered, and odorized; and other related equipment.

According to the record, the lines are capable of operating at pressures of between 1,433 and 2,866 pounds per square inch (psi) and were hydrostatically tested to at least 800 psi, which itself exceeds anticipated operating pressures for the system. There can be no doubt from the evidence in the record but that the pipeline facility constructed by TXO from its gas wells to ACC's charcoal plant meets the definition of a "major utility facility" as defined by Ark. Code Ann. Section 23-18-503(2)(C). It is clear

that the pipeline traverses a distance in excess of one mile and has the capability to deliver gas at pressures in excess of 125 psi.

■ The parties have devoted a great deal of energy arguing whether TXO or ACC, or both, qualify as a "utility" or "public utility." Ark. Code Ann. Section 23-18-503(9) refers to section 23-1-101(4)(A)(i) and defines those terms. An essential element of the definition is the contemplation that a utility or public utility sells, furnishes or otherwise delivers gas (or other utility service) to the public. The record in this case discloses that the only entity to which gas will be delivered through this pipeline is a private party, ACC. There is simply no evidence that it was constructed to serve any person or entity besides ACC, or that any other use is anticipated.

The parties agree that the proper resolution of this case turns on the intent of the General Assembly when it enacted the "Utility Facility Environmental and Economic Protection Act," Ark. Code Ann. Section 23-18-501 *et seq.* The intent of the legislature is stated in the "legislative findings and declarations" set out in Ark. Code Ann. Section 23-18-502, which provides in part as follows:

(d) Furthermore, the General Assembly finds that there should be provided an adequate opportunity for individuals, groups interested in energy and resource conservation and the protection of the environment, state and regional agencies, local governments, and other public bodies to participate in timely fashion in decisions regarding the location, financing, construction, and operation of major facilities.

(e) The General Assembly, therefore, declares that it shall be the purpose of this subchapter to provide a forum with exclusive and final jurisdiction, except as provided in Sections 23-18-505 and 23-18-506, for the expeditious resolution of all matters concerning the location, financing, construction, and operation of electric generating plants and electric and gas transmission lines and associated facilities in a single proceeding to which access will be open to individuals, groups, state and regional agencies, local governments, and other public bodies to enable them to participate in these decisions. These matters presently

under the jurisdiction of multiple state, regional, and local agencies are declared to be of statewide interest.

When we seek to determine the intent of the Act as applied to the instant case, we are guided by the Arkansas Supreme Court, which has said:

> When construing statutes, the primary object is to carry out the legislative intent which is determined primarily from the language of the statute considered in its entirety. *Henderson* v. *Russell*, 267 Ark. 140, 589 S.W.2d 565 (1979); *Ark. State Highway Comm.* v. *Mabry*, 229 Ark. 261, 315 S.W.2d 900 (1958). In the absence of any indication of a different legislative intent, we give words their ordinary and commonly accepted meaning. The meaning of a statute must be determined from the natural and obvious import of the words without resorting to subtle and forced construction for the purpose of limiting or extending the meaning. *City of North Little Rock* v. *Montgomery*, 261 Ark. 16, 546 S.W.2d 154 (1977); *Hicks* v. *Ark. State Medical Board*, 260 Ark. 31, 537 S.W.2d 794 (1976).

*Thompson, Mayor* v. *Younts*, 282 Ark. 524, 527, 669 S.W.2d 471 (1984).

We believe that the General Assembly's expression of intent as set out in Ark. Code Ann. Section 23-18-502 (1987) demonstrates that the legislature intended to provide a forum for any interested person or entity to participate in governmental proceedings pertaining, among other things, to the construction, location and operation of major utility facilities. Primarily, the legislature contemplated that the provisions of the Act would apply in most instances to the activities of "utilities" or "public utilities" as defined by the statutes referred to above. Nevertheless, simply because a gas transmission line may be owned and operated for the purpose of serving a private entity rather than the public in general does not mean that it cannot be a "major utility facility" for some purposes. Although the appellants urge that an understanding of the definition of "major utility facility" requires reference to the definitions of "utility" and "public utility" found elsewhere in the Arkansas Code provisions pertaining to utilities, the legislature plainly stated in Ark. Code Ann. Section 23-18-

503(2) that "[m]ajor utility facility *means*:" and then proceeded to describe exactly those things it intended the definition to encompass, one of which is a pipeline of the type built, owned and operated by the appellants here.

Since the gas transmission line in this case meets the plain definition of "major utility facility," the question becomes the extent to which the Act applies to this facility. While the parties have made several arguments as to the harmonious reading of the Act's various provisions in conjunction with other applicable statutes and definitions, three facts are clear. First, the provisions of Ark. Code Ann. Section 23-18-501 *et seq.* have some application to the gas transmission line in this case because it meets the Act's definition of a "major utility facility." Second, it is a major utility facility "[f]or the *sole* purpose of requiring an environmental impact statement" under the provisions of the Act. Third, the requirements of an "environmental impact statement" are set out in section 23-18-511(8)(B) of the Act.

It is obviously true that the Act's section 23-18-510(a) provides that no person shall commence to construct a major utility facility in this state, unless exempted as indicated in that section, without first having obtained a "certificate of environmental compatibility and public need" from the Commission. But, since section 23-18-503(2)(C) contains the only definition in the Act that applies to the gas transmission line involved in this case, and since that definition only applies "for the *sole* purpose of requiring an environmental impact statement hereunder," we think it is clear that the requirement in section 23-18-510(a) for a "certificate of environmental compatibility and public need" does not apply to the gas transmission line in this case. Furthermore, that is the only certificate required by the Act.

We are not authorized to pass upon the General Assembly's wisdom in enacting the legislation involved in this case. We would note, however, that it appears to be within the "legislative findings and declarations," set out in Ark. Code Ann. Section 23-18-502(d) and (e), to require only an "environmental impact" statement for the construction of the pipeline in this case in lieu of the "certificate of environmental compatibility and public need" which would be required of a utility serving the public. This would alert the Commission to the fact that the facility would be

constructed and allow the Commission to determine whether the facility would serve the public. And, even if it did not serve the public, the filing of the impact statement would put the facility on record with the Commission as interested in the protection of the environment, which is in keeping with section 23-18-502(d).

However, our duty is to decide only the issues before us. An "environmental impact" statement has been filed in this case. In its Order No. 39, the Commission stated that "from the initiation of this Docket" the primary issue had been whether a "certificate of environmental compatibility and public need" should have been sought and obtained prior to the construction of the gas transmission line involved. Because the certificate had not been obtained, the cease and desist order was issued. We affirm the APSC finding that the gas transmission line involved in this case is a "major utility facility." However, we find it is a "major utility facility" only for the sole purpose of requiring the filing of an environmental impact statement. The APSC finding that a certificate of environmental compatibility and public need must be obtained for the facility is reversed; therefore, it was error to issue the cease and desist order, and the order of the APSC in that regard is also reversed.

Affirmed in part; reversed in part.

COULSON, J., concurs.

CORBIN, C.J., and COOPER, J., dissent.

BETH GLADDEN COULSON, Judge, concurring. I concur with the majority, but I wish to briefly articulate my somewhat more expansive view of the statutory scheme at issue in this case.

First, the pipeline constructed by appellants undeniably fits the definition of "major utility facility" found in Ark. Code Ann. Section 23-18-503(2)(C). The pipeline is a major utility facility because the statute says it is "for the *sole* purpose of requiring an environmental impact statement." "Sole" means "single" or "only" or "exclusive." Thus, it follows that appellants' pipeline in this case is a "major utility facility" for one single, exclusive purpose: for the filing of an environmental impact statement under the provisions of the Act.

The only provisions of the Act which speak to an "environ-

mental impact statement" are those set forth under Ark. Code Ann. Section 23-18-511 (1987). That provision of the Act articulates what the General Assembly saw fit to authorize the APSC to require of an applicant for a "Certificate of Environmental Compatibility and Public Need." Section 8 speaks to environmental impact statements and, in my view, a sensible interpretation of the statutory scheme would contemplate that a non-public utility seeking to build a "major utility facility" apply for a certificate and that its application is required to include only an environmental impact statement, as defined in section 23-18-511(8), and not the financial data and economic analyses mentioned elsewhere in section 23-18-511.

Once an application for a certificate is filed, the statutory mechanisms could logically proceed through the public notice and hearing provisions outlined in sections 23-18-513 through 23-18-527. This would allow the General Assembly's intent stated in section 23-18-502(e) "to provide a forum with exclusive and final jurisdiction" for resolution of matters pertaining to major utility facilities to be properly and adequately addressed.

JAMES R. COOPER, Judge, dissenting. I dissent. The General Assembly clearly articulated its intentions when it enacted the Utility Facility Environmental and Economic Protection Act, and those intentions are codified in Ark. Code Ann. Section 23-18-502 (1987). That expression of legislative intent clearly shows that the legislature was concerned with facilities connected with providing *public* utility services.

The majority carves the definition of "major utility facility" out of Ark. Code Ann. Section 23-18-503 (1987) and finds that the filing of an environmental impact statement may be required of any entity, public or private, which seeks to build something which meets that definition. Such a view is too narrow, in my opinion, and ignores the fact that *public* utility service dominates the language of the Act. While I acknowledge that the pipeline in controversy here meets the raw definition of "major utility facility," to me the conclusion is inescapable that the Act applies only to public utilities and not to private business enterprises such as the appellant corporations.

The General Assembly's expression of intent to regulate only

public utilities building major utility facilities is plain and unambiguous. Ark. Code Ann. Section 23-18-502 reads in its entirety as follows:

(a) The General Assembly finds and declares that there is at present and will continue to be a growing need for electric and gas *public utility services* which will require the construction of major new facilities. It is recognized that the facilities cannot be built without in some way affecting the physical environment where such facilities are located and without the expenditure of massive amounts of capital.

(b) The General Assembly further finds that it is essential in the public interest to minimize any adverse effect upon the environment and upon the quality of life of the people of the state which *such new facilities* might cause and to minimize the economic costs to the people of the state of obtaining reliable, clean, safe, and adequate energy supplies.

(c) The General Assembly further finds that present laws and practices relating to the location, financing, construction, and operation of *the utility facilities* should be strengthened to protect environmental values, to encourage the development of alternative renewable and nonrenewable energy technologies which are energy-efficient, and to take into account the total cost to society of such facilities. Present laws and practices may result in undue costly delays in new construction, may encourage the development of energy technologies which are relatively inefficient, and may increase costs, which will eventually be borne by the people of the state in the form of *higher utility rates.* These existing laws and practices threaten the ability of *utilities* to meet the needs of the people of the state for economical and reliable utility service.

(d) Furthermore, the General Assembly find that there should be provided an adequate opportunity for individuals, groups interested in energy and resource conservation and the protection of the environment, state and regional agencies, local governments, and other public

bodies to participate in timely fashion in decisions regarding the location, financing, construction, and operation of major facilities.

(e) The General Assembly, therefore, declares that it shall be the purpose of this subchapter to provide a forum with exclusive and final jurisdiction, except as provided in Sections 23-18-505 and 23-18-506, for the expeditious resolution of all matters concerning the location, financing, construction, and operation of electric generating plants and electric and gas transmission lines and associated facilities in a single proceeding to which access will be open to individuals, groups, state and regional agencies, local governments, and other public bodies to enable them to participate in these decisions. These matters presently under the jurisdiction of multiple state, regional, and local agencies are declared to be of statewide interest. [Emphasis added.]

A fair reading of this *entire* expression of legislative intent can only lead to the inescapable conclusion that the Act was designed to apply only to facilities constructed by public utilities and not those built by private entities not otherwise engaged in providing public utility service. Since the APSC is exercising authority delegated to it by the legislature, the legislature could have clearly and specifically delegated authority to the APSC to regulate private businesses seeking to build facilities which meet the definition of a "major utility facility," at least in terms of environmental impact. I do not agree that the 1977 Amendment to Ark. Code Ann. Section 23-18-503(2)(B) and (C), which added the language relied on by the majority, "for the sole purpose of requiring an environmental impact statement hereunder," clearly shows that the legislature intended the Act to cover construction such as is involved in this case. We should remember that section 23-18-507(a) specifically provides that nothing in the subchapter we are dealing with should be construed so as to confer regulatory power on the APSC over persons not otherwise subject to the Commission's jurisdiction, yet that is exactly what the majority opinion does.

Arkansas Code Annotated Section 23-18-510 provides that a major utility facility may not be constructed without a "Certifi-

cate of Environmental Compatibility and Public Need." Ark. Code Ann. Section 23-18-511 prescribes what an application for such a certificate must contain:

An applicant for a certificate shall file with the Arkansas Public Service Commission a verified application in such form as the Arkansas Public Service Commission may prescribe and containing the following information:

(1) A general description of the location and type of the major utility facility proposed to be built;

(2) A general description of any reasonable alternate location or locations considered for the proposed facility;

(3) A statement of the need and reasons for construction of the facility;

(4) A statement of the estimated costs of the facility and the proposed method of financing the construction of the facility;

(5)(A) A general description of any reasonable alternate methods of financing the construction of the facility;

(B) A description of the comparative merits and detriments of each alternate financing method considered;

(C) If, at the time of filing of the application, the federal income tax laws and the state laws would permit the issuance of tax-exempt bonds to finance the construction of the proposed facility for the applicant by a state financing agency, the application shall also include a discussion of the merits and detriments of financing the facility with such bonds;

(6) An analysis of the projected economic or financial impact on the applicant and the local community where the facility is to be located as a result of the construction and the operation of the proposed facility;

(7) An analysis of the estimated effects on energy costs to the consumer as a result of the construction and operation of the proposed facility;

(8)(A) An exhibit containing an environmental impact statement, which shall fully develop the four (4) factors listed in subdivision (8) (B), treating in reasonable detail such considerations, if applicable, as the proposed facility's direct and indirect effect on the ecology of the land, air and water environment, established park and recreational areas, and on any sites of natural, historic, and scenic values and resources of the area in which the facility is to be located, and any other relevant environmental effects.

(B) The environmental impact statement shall set out:

(i) The environmental impact of the proposed action;

(ii) Any adverse environmental effects which cannot be avoided;

(iii) A description of the comparative merits and detriments of each alternate location or for generating plants, the energy production process considered, and a statement of the reasons why the proposed location and production process were selected for the facility;

(iv) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

(9) Such other information of an environmental or economic nature as the applicant may consider relevant or as the commission may by regulation or order require.

Clearly, (1) through (7) and the "economic" reference in (9) could not apply to a non-public utility or private business enterprise, and by their very language are directed at considerations which could have an impact on public utility rates. The only "certificate" authorized by the Act is one which may be issued after approval of an application containing *all* nine items enumerated in Ark. Code Ann. Section 23-18-511 and the bulk of those items relate solely to the State's interest in regulating *public utilities*. I think it inconsistent and erroneous to conclude, as the majority has, that one of the nine requirements of section 23-18-

511 may be carved out and held to apply to private business enterprise.

While I do not disagree that there exists a legitimate state interest in overseeing the construction of facilities which could cause severe and sometimes irreparable harm to our environment, I do not agree that the legislature has chosen to do so in this Act. For these reasons, I would reverse the decision of the Commission. I am authorized to state that Chief Judge Corbin joins in this dissent.